# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MAR-LEES SEAFOOD, LLC, MAR-LEES HOLDING LLC, and SEAFOOD DEVELOPMENT PARTNERS, LLC <br><br> Plaintiffs, <br><br> v. <br><br> JOHN A. LEES, JR., ML HOLDINGS, INC., NORATLANTIC 21, N.A. 21 HOLDINGS, LLC, BLUE SEA PRODUCTS LLC, THOMAS JACOB, MICHAEL SWEENEY, AND DUFFY & SWEENEY, LTD <br><br> Defendants. | Civil Action No. <u>13-12713</u> <br><br> **COMPLAINT FOR DAMAGES AND DEMAND FOR TRIAL BY JURY** |

## NATURE OF ACTION

1. This is an action brought under the federal Racketeering Influenced and Corrupt Organizations Act ("RICO") to recover, *inter alia*, damages for the losses suffered by plaintiffs Mar-Lees Seafood, LLC ("New Mar-Lees"), Mar-Lees Holding LLC ("Mar-Lees Holding"), and Seafood Development Partners, LLC ("Seafood Development") (collectively "Plaintiffs") as a direct result of the criminal racketeering activities orchestrated and carried out by Defendants John A. Lees, Jr. ("Lees") and ML Holdings, Inc. ("ML Holdings"). Lees and ML Holdings conducted the affairs of the RICO enterprises described below through a pattern of racketeering activity involving several fraudulent schemes accomplished by way of dozens of predicate acts of federal wire fraud, federal mail fraud, and kickbacks constituting commercial bribery in violation of

state law.  Defendants NorAtlantic 21, LLC ("NorAtlantic 21"), N.A. 21 Holdings, LLC

("NA Holdings"), Blue Sea Products LLC ("Blue Sea"), Thomas Jacob ("Jacob"),

Michael Sweeney ("Sweeney") and Duffy & Sweeney, Ltd. ("Duffy & Sweeney")

conspired with Defendant Lees to achieve Lees' fraudulent schemes and took numerous

actions in furtherance of their conspiracy.

2.   Prior to September 2010, Lees owned (directly and indirectly through ML Holdings) a

Massachusetts limited liability company named "Mar-Lees Seafood, LLC" with offices at

19 Ned's Point Road, Mattapoisett, Massachusetts ("Old Mar-Lees") which was in the

wholesale seafood purchase and sale business.  In September of 2010, Plaintiffs

purchased the assets of Old Mar-Lees through a complex asset-purchase transaction,

described in more detail below, and carried on the wholesale seafood purchase and sale

business through New Mar-Lees.

3.   Lees and ML Holdings engaged in a fraudulent scheme to inflate the apparent value of

Old Mar-Lees to Plaintiffs, and thereby to deceive Plaintiffs into purchasing the assets of

Old Mar-Lees, to inflate the price paid for those assets, to divert valuable goodwill into

other companies, and to misrepresent that Lees had no and would have no interests in

competing companies and would not be competing with New Mar-Lees going forward.

Lees and ML Holdings accomplished this, among other things, by repeatedly making

these representations prior to and at the time of the asset purchase, and by continuing

these misrepresentations and failing to disclose the truth on an ongoing basis after the

asset purchase, all the while secretly working with, and creating, operating, assisting

and/or investing in competing seafood companies, actively assisting the competing

entities and siphoning off key goodwill and customer relationships from Old Mar-Lees to those competing entities, and hiding Lees' involvement.  NorAtlantic 21, NA Holdings, Sweeney and Duffy & Sweeney all agreed to participate and participated with Lees in this fraudulent scheme.  Plaintiffs were damaged as a result of this fraudulent scheme.

4.   After the September 2010 asset purchase, Lees and ML Holdings used Lees' insider executive position at New Mar-Lees to carry out a series of additional fraudulent schemes by which Lees increased the price of seafood sold to New Mar-Lees by orchestrating secret round-trip seafood purchases using straw third parties, generating kickbacks to enrich himself and profits for his co-conspirators.  NorAtlantic 21, NA Holdings, Blue Sea, and Jacob all agreed to participate and participated with Lees in these fraudulent schemes.  Plaintiffs were damaged as a result of these fraudulent schemes.

### PARTIES, JURISDICTION AND VENUE

**Plaintiffs**

5.   New Mar-Lees is a Massachusetts limited liability company with offices in New Bedford, Massachusetts.  New Mar-Lees is engaged globally in the wholesale seafood purchase and sale business.

6.   Mar-Lees Holding is a Massachusetts limited liability company with offices in New Bedford, Massachusetts.  Mar-Lees Holding is the sole owner of New Mar-Lees.

7.   Seafood Development is a Delaware limited liability company with offices in New Bedford, Massachusetts.  Seafood Development is an 80% owner of Mar-Lees Holding. Seafood Development is the successor in interest to Harbinger Seafoods LLC ("Harbinger"), which had been the owner of the 80% interest in Mar-Lees Holding.

3

**Defendants**

8.   Defendant Lees is, upon information and belief, a resident of Mattapoisett, Plymouth

County, Massachusetts.  Up through September 2010, he was a member of the Board of

Managers of Old Mar-Lees, and became the sole manager of Old Mar-Lees in 2010.  He

was and remains the owner of Old Mar-Lees, and he served in the capacity of Chief

Executive Officer of Old Mar-Lees.  After the September 2010 asset purchase, Lees

became the President and Chief Executive Officer of New Mar-Lees, and served in those

roles through February 9, 2011.  JAL Consulting, Inc. ("JAL"), is a Florida corporation,

solely owned by Lees, with offices at 19 Ned's Point Road, Mattapoisett, Massachusetts,

and on information and belief, in Naples, Florida.  Beginning in June 2011 and

continuing through December 26, 2012, Lees served as Co-Chief Executive Officer of

New Mar-Lees, including through a Consulting Services Agreement between JAL and

New Mar-Lees.  Lees owns, personally and through ML Holdings, a total of twenty

percent (20%) of Mar-Lees Holding, which in turn owns New Mar-Lees.  In addition, on

September 29, 2010, Lees and ML Holdings together exercised the right to appoint one

member to the Board of Managers of Mar-Lees Holding by appointing Lees, and he has

served as a board member since that time.  Lees is a "person" as defined in 18 U.S.C. §

1961(3).

9.   Defendant ML Holdings is a Massachusetts corporation with offices at 19 Ned's Point

Road, Mattapoisett, Massachusetts.  On information and belief, Lees solely owns ML

Holdings, and ML Holdings owns a portion of Lees' twenty percent (20%) ownership of

Mar-Lees Holding, which in turn owns New Mar-Lees.  Sweeney is the assistant

secretary of ML Holdings.  ML Holdings is a "person" as defined in 18 U.S.C. § 1961(3).

10. Defendant NA Holdings is a Massachusetts limited liability company formed in 2010

with offices at 19 Ned's Point Road, Mattapoisett, Massachusetts.  Lees' wife, Pamela

Lees, is the sole owner of NA Holdings.  NA Holdings is a "person" as defined in 18

U.S.C. § 1961(3).

11. Defendant NorAtlantic 21 is a Massachusetts limited liability company formed in 2010

with offices at 36 North Water Street, 2nd Floor, New Bedford, Massachusetts.  NA

Holdings owns a sixty-five percent (65%) equity interest in NorAtlantic 21.  NorAtlantic

21 is a "person" as defined in 18 U.S.C. § 1961(3).  James Dwyer ("Dwyer") is the thirty-

five percent (35%) owner of NorAtlantic 21.

12. Defendant Blue Sea is a New Jersey limited liability company, with a place of business at

231 Elm Street, Perth Amboy, New Jersey.  Blue Sea is a "person" as defined in 18

U.S.C. § 1961(3).

13. Defendant Jacob is, on information and belief, a resident of New Jersey.  Jacob is the

chief executive officer of Blue Sea.  Jacob is a "person" as defined in 18 U.S.C. §

1961(3).

14. Defendant Sweeney is, on information and belief, a resident of Rhode Island.  Sweeney is

and has been legal counsel to Lees, Old Mar-Lees, New Mar-Lees, ML Holdings, JAL,

NA Holdings, and NorAtlantic21.  In addition, Sweeney is the assistant secretary of ML

Holdings.  Throughout the relevant period, Sweeney served as an authorized signatory for

filings with the Massachusetts Secretary of State for Old Mar-Lees, NA Holdings,

NorAtlantic 21, and New Mar-Lees.  Sweeney is a "person" as defined in 18 U.S.C. § 1961(3).

15. Defendant Duffy & Sweeney Ltd. ("Duffy & Sweeney") is a Rhode Island corporation, with an office at One Financial Plaza, Suite 1800, Providence, Rhode Island.  Sweeney is a founding partner of, and shareholder in, Duffy & Sweeney, which also employs other attorneys who have provided legal counsel to Lees, Old Mar-Lees, New Mar-Lees, ML Holdings, JAL, NA Holdings, and NorAtlantic 21.  Duffy & Sweeney is a "person" as defined in 18 U.S.C. § 1961(3).

**Jurisdiction and Venue**

16. Jurisdiction is provided by 28 U.S.C. §§ 1331 and 18 U.S.C. § 1964(a).

17. Venue is found in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a).

## FACTS COMMON TO ALL COUNTS

**The RICO Enterprises**

18. During the relevant time periods described below, the association in fact among John Lees, Old Mar-Lees and New Mar-Lees constituted an "enterprise" as defined in 18 U.S.C. § 1961(4) (the "Mar-Lees Enterprise").  John Lees served as President and CEO of both Old Mar-Lees and New Mar-Lees, directing their sales and business activities. Up through the asset purchase on September 29, 2010, Old Mar-Lees was engaged in the business of wholesale seafood purchases from suppliers and sales to customers located throughout the United States and around the world, and New Mar-Lees carried on that business with essentially the same employees, suppliers and customers from the date of the asset purchase going forward.  Up through the asset purchase on September 29, 2010,

Old Mar-Lees purchased raw materials and other products across state and international lines, and sold value-added seafood products in interstate and international commerce, and New Mar-Lees carried on those activities with essentially the same employees, suppliers and customers from the date of the asset purchase going forward. Consequently, the Mar-Lees Enterprise was engaged in activities that affected interstate commerce.

19. During the relevant time periods described below up through the September 29, 2010 asset purchase, Old Mar-Lees, a Massachusetts limited liability company with an office located in Massachusetts, was an "enterprise" as defined in 18 U.S.C. § 1961(4) (the "Old Mar-Lees Enterprise").  Old Mar-Lees was engaged in the business of wholesale seafood purchases from suppliers located throughout the United States and around the world and sales to customers located throughout the United States and around the world.  Old Mar-Lees purchased raw materials and other products across state and international lines, and sold value-added seafood products in interstate and international commerce, and therefore Old Mar-Lees was engaged in activities that affected interstate commerce.

20. During the relevant time periods described below beginning with the September 29, 2010 asset purchase, New Mar-Lees, a Massachusetts limited liability company with an office located in Massachusetts, was an "enterprise" as defined in 18 U.S.C. § 1961(4) (the "New Mar-Lees Enterprise").  New Mar-Lees is engaged in the business of wholesale seafood purchases from suppliers located throughout the United States and around the world and sales to customers located throughout the United States and around the world. New Mar-Lees purchases raw materials and other products across state and international

lines, and sells value-added seafood products in interstate and international commerce, and therefore New Mar-Lees is engaged in activities that affected interstate commerce.

21. Lees and ML Holdings were employed by or associated with the Mar-Lees Enterprise in multiple ways.  Lees was an owner, both directly and indirectly through ML Holdings, of Old Mar-Lees.  Lees served as president of Old Mar-Lees, as well as being an officer of Old Mar-Lees, and he controlled its business operations.  Lees and ML Holdings were both Sellers of the assets of Old Mar-Lees to Plaintiffs in the September 2010 asset sale described below.  Lees, both individually and on behalf of ML Holdings, was personally involved in the negotiation of the September 2010 asset sale, dealing directly with the Plaintiffs and their representatives.  After the asset sale, Lees and ML Holdings were owners of 20% of Mar-Lees Holding, which in turn owns New Mar-Lees, and Lees was an officer of New Mar-Lees, controlling key aspects of its business operations.  During the period June 2011 through December 2012, Lees personally and through a consulting services contract with his wholly-owned consulting firm JAL, served as Co-Chief Executive Officer of New Mar-Lees, controlling key aspects of its business operations.

22. Lees and ML Holdings were employed by or associated with the Old Mar-Lees Enterprise in multiple ways.  Lees was an owner, both directly and indirectly through ML Holdings, of Old Mar-Lees.  Lees served as president of Old Mar-Lees, as well as being an officer of Old Mar-Lees, and he controlled its business operations.  Lees and ML Holdings were both Sellers of the assets of Old Mar-Lees to Plaintiffs in the September 2010 asset sale described below.  Lees, both individually and on behalf of ML Holdings,

was personally involved in the negotiation of the September 2010 asset sale, dealing directly with the Plaintiffs and their representatives.

23. Lees and ML Holdings were employed by or associated with the New Mar-Lees Enterprise in multiple ways.  Lees and ML Holdings are owners of 20% of Mar-Lees Holding, which in turn owns New Mar-Lees.  Lees served as president of New Mar-Lees from September 29, 2010 through February 9, 2011, as well as being an officer of New Mar-Lees, and he controlled key aspects of its business operations.  In addition, on September 29, 2010 Lees and ML Holdings together exercised the right to appoint one member to the Board of Managers of Mar-Lees Holding by appointing Lees, and he has served as a board member since that time.  During the period June 2011 through December 2012, Lees personally and through a consulting services contract with his wholly-owned consulting firm JAL, served as Co-Chief Executive Officer of New Mar-Lees, controlling key aspects of its business operations.

**The RICO Violations**

24. As described more fully below, Lees and ML Holdings conducted and participated in the conduct of the affairs of the Mar-Lees Enterprise through a pattern of racketeering activity involving numerous acts of commercial bribery in violation of state law and federal wire and mail fraud in connection with multiple fraudulent schemes.  These schemes included (i) a fraudulent scheme to inflate the apparent value of Old Mar-Lees to Plaintiffs, and thereby to deceive Plaintiffs into purchasing the assets of Old Mar-Lees, to inflate the price paid for those assets, to divert valuable goodwill into other companies, and to misrepresent that Lees had no and would have no interests in competing

companies and would not be competing with New Mar-Lees going forward (summarized in paragraph 25, below) and (ii) a series of fraudulent schemes by which Lees used his insider executive position at New Mar-Lees to orchestrate round-trip seafood transactions, and ultimately to cause New Mar-Lees to pay inflated prices for the seafood, all to generate kickbacks to Lees and profits to his co-conspirators (summarized in paragraph 26, below). The kickbacks solicited by Lees and paid by, among others, Blue Sea and Jacob constituted commercial bribery in violation of state law, specifically Mass. Gen. Laws c. 271, §39. The fraudulent schemes related to funding the kickbacks involved numerous misrepresentations and omissions of material fact made to Plaintiffs by Lees, and others working for him, with an intent to defraud, causing New Mar-Lees to pay inflated prices for seafood to generate funds to pay the kickbacks. The fraudulent scheme related to the fraud in the asset sale, the diversion of goodwill and the secret competition involved numerous misrepresentations and omissions of material fact made to Plaintiffs with an intent to defraud by Lees and ML Holdings, and others working with them. Lees and ML Holdings used, caused to be used, or reasonably foresaw the use of, the United States mail, commercial carriers, and interstate and international wire communications, including electronic mail communications, in furtherance of all of these fraudulent schemes in violation of 18 U.S.C. § 1341 and § 1343. The numerous predicate acts of commercial bribery in violation of state law, and federal wire and mail fraud were related and continued over an extended period of time, and constituted a pattern of racketeering activity as defined in 18 U.S.C. § 1962(c).

25. As described more fully below, Lees and ML Holdings conducted and participated in the conduct of the affairs of the Old Mar-Lees Enterprise through a pattern of racketeering activity involving numerous acts of federal wire and mail fraud in connection with a fraudulent scheme to inflate the apparent value of Old Mar-Lees to Plaintiffs, and thereby to deceive Plaintiffs into purchasing the assets of Old Mar-Lees, to inflate the price paid for those assets, to divert valuable goodwill into other companies, and to misrepresent that Lees had no and would have no interests in competing companies and would not be competing with New Mar-Lees going forward. Lees and ML Holdings accomplished this by, among other things, repeatedly representing that they were transferring all of Old Mar-Lees' goodwill and other assets to Plaintiffs and that Lees would devote all of his efforts to the New Mar-Lees business and would not be competing with New Mar-Lees going forward, and by continuing these misrepresentations and failing to disclose the truth on an ongoing basis after the asset purchase, all the while secretly working with, and creating, operating, assisting and/or investing in competing seafood companies, then actively working for the competing entities and siphoning off key goodwill and customer relationships from Old Mar-Lees to those competing entities, and hiding Lees' involvement. This fraudulent scheme involved numerous misrepresentations and omissions of material fact made to Plaintiffs with an intent to defraud by Lees and ML Holdings, and others working with them. Lees and ML Holdings used, caused to be used, or reasonably foresaw the use of, the United States mail, commercial carriers, and interstate and international wire communications, including electronic mail communications, in furtherance of these fraudulent schemes in violation of 18 U.S.C. §

1341 and § 1343.  The numerous predicate acts of federal wire and mail fraud were
related and continued over an extended period of time beginning at least as early as June
2010 and continuing through 2012, and would have continued had Lees' misconduct not
been discovered.  The numerous predicate acts of federal wire and mail fraud constituted
a pattern of racketeering activity as defined in 18 U.S.C. § 1962(c).

26. As described more fully below, Lees and ML Holdings conducted and participated in the
conduct of the affairs of the New Mar-Lees Enterprise through a pattern of racketeering
activity involving numerous acts of federal wire and mail fraud in connection with
multiple fraudulent schemes, and including multiple acts of commercial bribery in
violation of state law.  These schemes included a series of fraudulent schemes by which
Lees and ML Holdings used Lees' insider executive position at New Mar-Lees to
orchestrate round-trip seafood transactions involving Blue Sea and other entities, and
ultimately to cause New Mar-Lees to pay inflated prices for the seafood, all to generate
kickbacks to Lees and profits to Blue Sea, Jacob, and others.  The kickbacks solicited by
Lees and paid by, among others, Blue Sea and Jacob constituted commercial bribery in
violation of state law, specifically Mass. Gen. Laws c. 271, §39.  The fraudulent schemes
involved numerous misrepresentations and omissions of material fact made to Plaintiffs
by Lees, and others working for him, with an intent to defraud, causing New Mar-Lees to
pay inflated prices for seafood to generate funds to pay the kickbacks.  Lees and ML
Holdings used, caused to be used, or reasonably foresaw the use of, the United States
mail, commercial carriers, and interstate and international wire communications,
including electronic mail communications, in furtherance of these fraudulent schemes in

12

violation of 18 U.S.C. § 1341 and § 1343.  The numerous predicate acts of commercial

bribery in violation of state law, and federal wire and mail fraud were related and

continued over an extended period of time, and constituted a pattern of racketeering

activity as defined in 18 U.S.C. § 1962(c).

27. As described more fully below, Sweeney and through him, Duffy & Sweeney, agreed

with Lees to participate in his fraudulent scheme to inflate the apparent value of Old Mar-

Lees to Plaintiffs, and thereby to deceive Plaintiffs into purchasing the assets of Old Mar-

Lees, to inflate the price paid for those assets, to divert valuable goodwill into other

companies, and to misrepresent that Lees had no and would have no interests in

competing companies and would not be competing with New Mar-Lees going forward,

and they took numerous actions in furtherance of that scheme.  Sweeney and Duffy &

Sweeney were retained by, and acted as legal counsel to, Old Mar-Lees, as well as to

Lees and ML Holdings.  Sweeney served as an officer of ML Holdings.  Sweeney was

personally involved in the negotiation of the September 2010 asset sale, dealing directly

with Plaintiffs and their representatives, drafting the principal sale documents and leading

the due diligence response process for Old Mar-Lees.  Sweeney and Duffy & Sweeney

were retained by, and acted as legal counsel to, New Mar-Lees, as well as ML Holdings,

JAL, and, on information and belief, NorAtlantic 21 and NA Holdings.  Sweeney

understood that Lees' commitment to the ongoing business of New Mar-Lees was

material to Plaintiffs, and was aware that Lees repeatedly represented that he was and

would be devoting his full energies to New Mar-Lees, and that he was not and would not

be competing with New Mar-Lees.  Sweeney was aware that such representations were

13

false, yet took a number of actions to assist Lees in making those misrepresentations and to carry out other key aspects of Lees' scheme, including by doing the legal work to create and maintain the competing business entities while hiding Lees' involvement, and by participating as a business partner in some of the ventures, all while purportedly representing New Mar-Lees.

28. As described more fully below, NA Holdings and NorAtlantic 21 agreed with Lees to participate in his fraudulent scheme in which Lees represented that he was transferring all of Old Mar-Lees' goodwill to Plaintiffs and that he would devote all of his efforts to the New Mar-Lees business and would not be competing with New Mar-Lees going forward, while simultaneously secretly working with, and creating, operating, assisting and/or investing in competing seafood companies such as NorAtlantic 21, then actively working for the competing entities and siphoning off key goodwill and customer relationships from Old Mar-Lees to those competing entities. NA Holdings and NorAtlantic 21 took numerous actions in furtherance of that scheme.

29. As described more fully below, Blue Sea and Jacob agreed with Lees to participate in his fraudulent schemes by which Lees used his insider executive position at New Mar-Lees to orchestrate round-trip seafood transactions involving Blue Sea and other entities, and ultimately to cause New Mar-Lees to pay inflated prices for the seafood, all to generate kickbacks to Lees and profits to Blue Sea, Jacob, and others.

**The September 2010 Purchase of the Assets of Old Mar-Lees by Plaintiffs**

30. On September 29, 2010, Lees, Old Mar-Lees, and ML Holdings (together the "Sellers"), and Plaintiffs Mar-Lees Holding and HSH Partners, LLC, executed an agreement (the

"Asset Purchase Agreement") in which Plaintiffs purchased the assets of Old Mar-Lees and certain real estate assets from the Sellers.  Plaintiff Seafood Development Partners' predecessor in interest, Harbinger Seafoods, LLC, paid nearly twenty-two million dollars ($22,000,000) as the cash consideration.

31. Upon the purchase, HSH Partners, LLC received the assets of Old Mar-Lees, and carried out the business going forward.  Upon the purchase, Mar-Lees Holding became the sole member of HSH Partners, LLC.  Immediately after the purchase, HSH Partners, LLC changed its name to Mar-Lees Seafood LLC and is referred to throughout this complaint as "New Mar-Lees."

**Negotiations and Representations Leading To The Purchase Of Old Mar-Lees' Assets**

32. In the spring of 2010, representatives of the Plaintiffs were introduced to Lees and shortly thereafter, began discussing the possible acquisition of the assets of Old Mar-Lees.  In connection with that potential transaction, the Sellers, including Lees, were represented by Sweeney and his firm, Duffy & Sweeney, based in Providence, Rhode Island.  On information and belief, in approximately May of 2010, Sweeney and Lees contacted Brendan VanDeventer ("VanDeventer"), an investment banker and the then-managing partner of Riparian Partners Ltd. located in Providence, Rhode Island, to assist Lees in selling Old Mar-Lees.  VanDeventer (based in Rhode Island) routinely communicated with Lees (based in Massachusetts) and Sweeney (in Rhode Island) by email in furtherance of the negotiations leading to the asset sale, including an initial email on May 19, 2010 from VanDeventer to Lees, copying Sweeney, proposing that Lees engage Riparian Partners for this deal, and the June 30, 2010 engagement letter from Riparian

Partners sent to Lees, at his office at Old Mar-Lees, which was signed by Lees and returned by email from Lees to VanDeventer on July 8, 2010. The lead business representatives participating in the negotiations on behalf of the Plaintiffs were Dimitrijus Nikitinas and Kestutis Bruzas, and the legal and due diligence representatives for the Plaintiffs included attorney James Silkenat of Sullivan & Worcester based in New York City, New York, and Larry Kaplan of the accounting firm CBIZ Tofias based in Massachusetts (together, "Plaintiffs' Representatives"). On July 13, 2010, Lees exchanged emails directly with Nikitinas and Bruzas regarding a meeting between them and Sweeney and VanDeventer to discuss the proposed acquisition, and then subsequently Lees sent an email to Sweeney telling him "We need to sell them on ML [Mar-Lees]/ John Lees is the right group to start and pull it all together."

33. From the outset, Plaintiffs sought to acquire all of the goodwill and other assets of Old Mar-Lees, which included all supplier and customer relationships, and to obtain the full energies and efforts of Lees committed to the business going forward. The goodwill included the value of the Old Mar-Lees customer relationships and the non-compete agreements by Lees and the other Sellers. Lees consistently represented to the Plaintiffs that the Sellers were selling all of the assets, including the goodwill, of Old Mar-Lees and that he would devote all of his efforts to the New Mar-Lees business and would not be competing with New Mar-Lees going forward.

34. Discussions continued through the summer and into the fall of 2010, with detailed negotiations occurring in a number of ways, including without limitation by interstate telephone and email, including between Lees in Massachusetts, the lawyers and

investment bankers representing Lees and the other Sellers in Rhode Island and the lawyers representing the Plaintiffs in New York.  In July of 2010, as part of the negotiation and due diligence process, Sweeney and his firm Duffy & Sweeney assisted Lees and the other Sellers to establish an electronic "data room" into which the Sellers and Sweeney (or others at Duffy & Sweeney) uploaded various documents and other information from Old Mar-Lees' offices in Massachusetts or Sweeney's offices in Rhode Island for review by the Plaintiffs representatives as part of the pre-sale negotiations.  On July 28, Sweeney sent an email to the Plaintiffs' Representatives and to Plaintiffs' attorney in New York to inform them that the data room was up and running.  Beginning on or about July 29, 2010, the materials in the data room were then accessed and reviewed by Plaintiffs' representatives, including Plaintiffs' lawyers from their offices in New York and Plaintiffs' accountants in Massachusetts.

35. For example, on July 24, 2010, Nikitinas sent via email to Lees, with a copy to Sweeney and others, the Plaintiffs' initial due diligence request document.  On July 29, 2010, the Plaintiffs' attorney in New York sent an email to Sweeney in Rhode Island asking for a response to the list of items on their due diligence questionnaire.  Sweeney replied by email later that day, stating "we will send the questionnaire later today."  Later that day, an associate at Duffy & Sweeney sent the updated due diligence questionnaire via email to Plaintiffs' counsel in New York.

36. As another example, on August 19, 2010, Sweeney discussed the due diligence efforts by telephone with Plaintiffs' attorney James Silkenat in New York, and subsequently Plaintiffs' accountants at CBIZ Tofias sent Sweeney an email with a list of due diligence

questions and document requests.  Sweeney then forwarded that request by email to Lees

and VanDeventer, and Lees caused employees at Old Mar-Lees to upload documents to

the data room in response.  Among other things, on or before September 8, 2010,

documents and information uploaded to the data room and/or sent by email to Plaintiffs'

attorney in New York included schedules listing suppliers and customers of Old Mar-

Lees.  Those schedules listed Blue Sea and NorAtlantic 21 among the multitude of

suppliers and customers, but nowhere did Lees disclose that either NorAtlantic 21 or Blue

Sea were related to Lees in any way.  In other schedules, Lees disclosed a number of

"related party" companies, including several fishing boats in which he had ownership

interests and other businesses in which his wife had ownership interests, but nowhere in

those schedules did Lees disclose his and his wife's interest in NA Holding or

NorAtlantic 21 or his financial relationship and involvement with NorAtlantic 21 or with

Blue Sea.

**Fraudulent Scheme to Divert Goodwill From, and Secretly Compete With, New Mar-Lees**

37.  In the negotiations leading to, and in the final signed version of, the Asset Purchase

Agreement, Lees and ML Holdings made express representations that they were

delivering all of the goodwill in Old Mar-Lees to the Plaintiffs and were agreeing not to

compete with New Mar-Lees.  A substantial portion of the purchase price – more than

$12 million, which is more than half of the entire purchase price – was allocated to that

goodwill, including the value of the customer relationships and the non-compete

agreements from Lees and the other Sellers.

18

38.  Multiple drafts of the Asset Purchase Agreement containing these representations were
     exchanged with Lees' knowledge and approval via email between Sweeney and/or others
     from Duffy & Sweeney, as counsel for Lees and ML Holdings, in Rhode Island, and
     counsel for Plaintiffs at Sullivan & Worcester in New York, including on September 5,
     2010, September 9, 2010, September 14, 2010, September 23, 2010, September 24, 2010,
     and September 26, 2010, and drafts were discussed in numerous telephone conference
     calls in September among the parties as well.    The final version was signed by Lees,
     acting both individually and on behalf of ML Holdings, on September 29, 2010, and was
     sent to Lees in Massachusetts, Sweeney in Rhode Island, Plaintiffs' counsel in New York
     and others via email on October 1, 2010.  These representations included, for example:

     a.  In Section 2.01(a) of the Asset Purchase Agreement, Sellers represented that they
         were selling all "assets, properties and rights of every kind and nature ... (including
         goodwill) ...."

     b.  In Section 2.01(a)(xiii) of the Asset Purchase Agreement, Sellers stated again that
         they were delivering "all goodwill and the going concern value of the Business."

     c.  In Section 3.02 of the Asset Purchase Agreement, Sellers stated that at closing they
         would deliver an Employment Agreement signed by Lees and a Non-Competition
         Agreement signed by Old Mar-Lees and ML Holdings, each containing previously
         agreed-upon terms and representations, including the express representations
         described below.

39.  In connection with the asset purchase transaction, on September 29, 2010, Lees executed
     an Employment Agreement with New Mar-Lees (the "Employment Agreement").  In the

negotiations leading to, and in the final signed versions of, the Employment Agreement
Lees made express representations that Lees was devoting his time and best efforts to the
business of New Mar-Lees, and would not compete with New Mar-Lees or undertake or
engage in any other business enterprise (other than as a passive investor).  Drafts of the
Employment Agreement containing these representations were exchanged with Lees'
knowledge and approval via email between Sweeney and/or others at Duffy & Sweeney,
as counsel for Lees, in Rhode Island, and counsel for Plaintiffs at Sullivan &  Worcester
in New York, including on September 22, 2010 and September 23, 2010.  The final
version was signed by Lees on September 29, 2010, and was sent to Lees in
Massachusetts, Sweeney in Rhode Island, Plaintiffs' counsel in New York and others via
email on October 1, 2010.  These representations included, for example:

a.   In Section 1 of the Employment Agreement, Lees expressly stated that he would
"devote substantially his full business time and best efforts to …the business and
affairs of [New Mar-Lees]" and that he would "not undertake or engage … in any
other employment, occupation or business enterprise other than one in which he is a
passive investor."

b.   In Section 7 of the Employment Agreement, Lees expressly acknowledged that, by
virtue of his continuing employment as the President of New Mar-Lees, he "has had,
and would continue to have, substantial access to and impact on the good will,
Confidential Information, and other legitimate business interests of [New Mar-Lees]"
and that he was therefore in a position to have a substantial adverse impact on those
business interests should he engage in business in competition with [New Mar-

Lees]…."  Lees expressly agreed that he would "not, directly or indirectly, for his own account, or in any capacity on behalf of any third person or entity, … engage, or assist others engaged, in whole or in part, in any business which directly competes with [New Mar-Lees] anywhere in the world," and that he was not, and would not be, investing in privately-held competing companies.  In this Employment Agreement, a business was deemed to be a direct competitor if it engaged in the business of, among other things, "distributing or selling seafood products."

40. In connection with the asset purchase transaction, on September 29, 2010, Lees, on behalf of Old Mar-Lees and ML Holdings, executed a Non-Competition and Non-Solicitation Agreement with New Mar-Lees and Mar-Lees Holding (the "Non-Compete Agreement").  In the negotiations leading to, and in the final signed versions of, the Non-Compete Agreement, Old Mar-Lees and ML Holdings agreed not to compete with New Mar-Lees.  Drafts of the Non-Compete Agreement containing these representations were exchanged with Lees' knowledge and approval via email between Sweeney and/or others at Duffy & Sweeney, as counsel for Lees, in Rhode Island, and counsel for Plaintiffs at Sullivan & Worcester in New York.  The Non-Compete Agreement was signed by Lees on behalf of ML Holdings (in his capacity as president) and Old Mar-Lees (in his capacity as manager), on September 29, 2010, and was sent to Lees in Massachusetts, Sweeney in Rhode Island, Plaintiffs' counsel in New York and others via email on October 1, 2010.

41. Lees and Sweeney understood that Lees' commitment to New Mar-Lees was material to the Plaintiffs, and intended that Plaintiffs and others rely on these representations.  For

example, in a July 14, 2010 meeting, Nikitinas and Bruzas told Sweeney that as part of

the acquisition terms Plaintiffs wanted Lees' "full time" commitment to the business

going forward.  In another example, on September 22, 2010, Sweeney sent a draft of the

Employment Agreement containing these representations by email from his office in

Rhode Island, copying Lees in Massachusetts, to the Massachusetts Development

Finance Agency ("MDFA") to provide assurance to the MDFA of Lees continued

commitment to the business as part of the effort by Lees and Sweeney to induce the

MDFA, which was a lender to Old Mar-Lees, to provide legal consents necessary to the

asset sale.

42. On September 29, 2010, Sellers also executed final versions of the "Disclosure

Schedules."  Those Disclosure Schedules listed Blue Sea and NorAtlantic 21 among the

multitude of suppliers and customers, but nowhere did Lees disclose that either

NorAtlantic 21 or Blue Sea were related to him in any way, or that Lees had invested in

or had a financial relationship with those companies.  Further, nowhere in the Disclosure

Schedules did Sellers disclose that, as set forth more fully below, they were diverting

goodwill and customer relationships to NorAtlantic 21 or to Blue Sea and that Lees was

profiting from the diversion.  To the contrary, Sellers expressly stated that they were

delivering all of the goodwill to Plaintiffs.

43. Each of Sellers' false statements and omissions described above was intended as part of

the fraudulent scheme to induce Plaintiffs to purchase Old Mar-Lees, and to make the

purchase at an artificially high price.  These statements were false at the time they were

made, Sellers knew them to be false, and they intended that Plaintiffs be misled by such statements.

44. These false statements and omissions were material to Plaintiffs.  Plaintiffs purchased the assets of  Old Mar-Lees in reasonable reliance upon the statements and omissions made by Sellers.

45. In furtherance of this fraudulent scheme, Lees and ML Holdings, with the assistance of Sweeney and Duffy & Sweeney, negotiated and finalized the Asset Purchase Agreement, the Employment Agreement, the Non-Compete Agreement, and the various related agreements, disclosure schedules, exhibits, and other associated documents.   This was accomplished, in part, by many interstate telephone calls and email communications, including but not limited to those described above.

**Sellers' Statements Were False: Lees Started and Assisted Competing Seafood Companies**

46. As set forth more fully below, Lees created, invested in, diverted New Mar-Lees' assets and opportunities to, and provided financial and other support to, competing seafood companies, both before and after the execution of the Asset Purchase Agreement, the Employment Agreement and the Non-Compete Agreement.

**NorAtlantic 21**

47. Unknown to Plaintiffs, in or about February of 2010 – approximately six months prior to the execution of the Asset Purchase Agreement – Lees and Sweeney, together with Dwyer, formed NorAtlantic 21.  On information and belief, Dwyer is a long-time personal friend and business associate of John Lees and his wife, Pamela Lees.  In or about December 2009, Lees and Dwyer agreed to form the company (initially called

"North Atlantic 21").  Lees contacted his accountant George Warner (based in Rhode Island) via email on December 7, 2009, telling Warner that "I am forming another company called North Atlantic 21.  The company will be owned 65% by me and 35% by Jamie Dwyer."  Dwyer replied by email later that day, stating that he "will gather all the information for Mike [Sweeney] and get a mail off to him.  I will address my significant points of concern, but when all is said and done its me and you.  You are one of a select few I trust."  Sweeney then assisted Lees and Dwyer concerning the formation of NorAtlantic 21, and Sweeney and his associates at Duffy & Sweeney drafted the NorAtlantic 21 operating agreement.

48. Unknown to Plaintiffs, also in or about February of 2010, Lees and Sweeney, together with Lees' wife Pamela Lees, formed NA Holdings, a holding company.  Lees' wife, Pamela Lees, is the nominal sole owner of NA Holdings, although, on information and belief, the use of the holding company was to conceal John Lees' involvement, and  in practice John Lees controlled NA Holdings and was actively involved in dealing with Dwyer and the NorAtlantic 21 business.  On information and belief, the sole purpose of the creation of NA Holdings was for it to serve as the vehicle to own Lees' indirect interest in NorAtlantic 21.

49. NA Holdings owns sixty-five percent (65%) of NorAtlantic 21.

50. From its inception, NorAtlantic 21 has been in the same business as New Mar-Lees: it sells seafood into the same markets as New Mar-Lees, and competes with New Mar-Lees.

51. Sweeney and Lees then subsequently agreed to secretly pass on the legal costs associated with the creation of NorAtlantic 21 to Harbinger (i.e., New Mar-Lees), buried in the large amount of legal fees charged by Sweeney and Duffy & Sweeney to Harbinger pursuant to the Asset Purchase Agreement.  For example, on July 29, 2010 Sweeney sent an email to Lees regarding the "old invoice for the Dwyer deal."  Lees responded by email, stating "we will add this to the 'DEAL' … okay.  This way it does not come out of my pocket." Ultimately, Lees and Sweeney exchanged multiple emails regarding Sweeney's invoices to Lees relating to NorAtlantic 21, culminating in emails on September 9, 2010, documenting their agreement in which Sweeney stated:  "[t]he remaining balance I will add to the Harbinger closing bill as you wanted so it is all one bill out of closing...." Sweeney's "Harbinger closing bill" did not disclose that a portion of the charges included on it was for the creation of NorAtlantic 21.

52. Dwyer owns the other thirty-five percent (35%) of NorAtlantic 21.   Dwyer agreed with Lees that Lees would help form, invest in, and own a significant portion of NorAtlantic 21, that Lees would provide substantial capital to support NorAtlantic 21's business operations, and that Lees would provide and support a variety of business opportunities for NorAtlantic 21.  On information and belief, Dwyer, Lees and Sweeney communicated on numerous occasions by email to discuss the purpose for and creation of NorAtlantic 21, and to exchange drafts of the operating agreement and other documents related to NorAtlantic 21.

53. Beginning in or about February 2010 (long before the Asset Purchase Agreement was executed), and continuing, on information and belief, through the present, Lees, through

his wife's nominal ownership of NA Holdings, invested over one million dollars ($1,000,000) in NorAtlantic 21.  Lees had made and intended to continue to make these investments at the time he made his representations to the Plaintiffs that he did not have and would not make investments in competing companies, rendering those representations false when made.  NA Holdings knew that Lees had obligations not to compete with New Mar-Lees.  NA Holdings, acting through Pamela Lees and Sweeney, agreed with Lees that Lees would help form, invest in, and own a significant portion of NorAtlantic 21, that Lees would provide substantial capital to support NorAtlantic 21's business operations, and that Lees would provide and support a variety of business opportunities for NorAtlantic 21, all to the detriment of New Mar-Lees, concealed from Plaintiffs, and in violation of Lees' representations and obligations to New Mar-Lees.

54.  Lees also caused Old Mar-Lees to provide NorAtlantic 21 with tens of thousands of dollars of office space and assistance from Old Mar-Lees' employees beginning in approximately January 2010, without any compensation to Old Mar-Lees.

55.  Lees and Dwyer routinely communicated by email in furtherance of this scheme regarding Lees substantial investments in NorAtlantic 21, including without limitation:

    a.  On October 1, 2010, (just days after Lees signed the Asset Purchase Agreement and the Employment Agreement) Dwyer sent an email to Lees asking for "an additional $159,600" from Lees to fund the balance of a purchase of scallops by Dwyer and NorAtlantic21.  Later on October 1, Lees replied by email to Dwyer.  On information and belief, Lees provided that requested funding to Dwyer and NorAtlantic 21.

b. On April 10, 2011, Lees sent an email to Dwyer summarizing their recent meeting, referring to separate investments by Lees of $86,000, $320,000 and $856,000, specifying interest payments due from Dwyer to Lees of more than $35,000 and describing Lees' agreement to structure the payments in a way favorable to Dwyer. In the email, Lees states that "this gives you [Dwyer] all the time needed and I am doing the right thing for the company [referring to NorAtlantic21]."

56. Lees diverted New Mar-Lees' assets and opportunities to NorAtlantic 21, and provided other support which substantially assisted NorAtlantic 21, by, *inter alia*:

a. In October of 2010, immediately after the September 2010 asset purchase, Lees shared confidential internal Mar-Lees information relating to a particular New Mar-Lees customer, via email with Dwyer, and encouraged Dwyer to have NorAtlantic 21 take this business. On September 21, 2010, the representative of that particular customer, based in Spain, had sent an email to Lees at Old Mar-Lees in which he inquired whether Mar-Lees was "still interested in becoming a supplier" and provided detailed information concerning the quantity and quality of the products the customer was seeking. Dwyer responded by email within a few minutes, stating "OK. I will take care of that and let you know how that goes." On October 12, 2010, Lees forwarded the customer's email to Dwyer, stating, "we need this business." Dwyer replied by email, stating "I am ready to make the call whenever you are." Lees replied by email almost immediately, asking "How is my investment in NA21 doing…?" and then a few minutes later, Lees sent another email to Dwyer stating "I am trying to be careful with the [specific customer's name] connection for obvious

reasons.  Please send an email to him saying that John Lees has been trying to reach him and wants to introduce NA21 as the supplier."

b.   On November 9, 2010, Lees sent several emails to Dwyer discussing the financing of a transaction for NorAtlantic 21 with a supplier in China, forwarding email communications from that supplier in China, and telling Dwyer to "explain who NorAtlantic 21 is" by saying it is "the import arm for Mar-Lees" which was not true.

c.   On information and belief, Lees and Dwyer communicated via email on numerous other occasions to divert existing customers or other business opportunities from New Mar-Lees to NorAtlantic 21, or to interject NorAtlantic 21 between Mar-Lees and suppliers as an unnecessary middle-man, to the benefit of NorAtlantic 21 and the detriment of New Mar-Lees.

57.  At all times NA Holding and NorAtlantic 21 agreed with Lees to carry out this scheme, including but not limited to taking each of the actions in furtherance of the scheme in conjunction with Lees as described above.  NA Holding and NorAtlantic 21 knew that Lees had obligations not to compete with New Mar-Lees, agreed with Lees that Lees would continue to invest in and own a significant portion of NA Holding and NorAtlantic 21, that Lees would continue to provide substantial capital to support NA Holding and NorAtlantic 21's business operations, and that Lees would continue to provide and support a variety of business opportunities for NorAtlantic 21, all to the detriment of New Mar-Lees, concealed from Plaintiffs, and in violation of Lees' representations and obligations to New Mar-Lees.

58. Lees never disclosed his interests in NA Holding and NorAtlantic 21, or his activities to assist and promote NA Holding and NorAtlantic 21, to Plaintiffs.

**<u>Blue Sea</u>**

59. Unknown to Plaintiffs, Lees also invested in and provided financial support to another seafood company, Blue Sea, and used it to secretly compete against New Mar-Lees.

60. Blue Sea is in the same business as New Mar-Lees: it sells seafood into the same markets as New Mar-Lees, and competes with New Mar-Lees.

61. Jacob is one of the owners of Blue Sea.

62. Lees invested at least three quarters of a million dollars ($750,000) in Blue Sea, and on information and belief provided other financial support to Blue Sea, beginning at least as early as the spring of 2010.  Lees (in Massachusetts) and Jacob (in New Jersey) communicated by email on numerous occasions, including, for example:

   a. On May 13, 2010, Lees sent an email to Jacob regarding a wire of $100,000 from Blue Sea to John Lees' personal account, stating, "[p]lease make sure you send the wire to me by tomorrow."

   b. On June 4, 2010, Lees sent an email to Jacob referring to sales of shrimp to another specific New Mar-Lees customer, stating that "I [Lees] told him I am one of the owners of Blue Sea Products."

   c. On September 28, 2010, (just a day before Lees signed the Asset Purchase Agreement and the Employment Agreement), Lees sent an email to Jacob in which he provided Jacob with bank wire instructions for Jacob to use to send an interstate wire transfer of $300,000 from Jacob and Blue Sea to Lees' personal account at Webster Bank in

Waterbury, Connecticut.  Later that day, Jacob replied by email to Lees, copying Jacob's accountant, as well as other business associates in India, confirming that the $300,000 wire transfer had taken place and that an additional $200,000 would be paid within the next few months.

d. On November 21, 2010, Lees sent an email to Jacob stating, "[p]lease get my commission checks paid up to date."

e. On December 4, 2010, Lees sent an email to Jacob stating, "WHEN will I get paid for all my outstanding commissions…?"

f. On December 30, 2010, Jacob sent an email to Lees, describing a $0.15/pound commission on shrimp skewers to be paid to Lees from Blue Sea.

g. Jacob sent an email to various individuals at Blue Sea, as well as an individual in India, copying Lees, on February 11, 2011, relating to a $250,000 loan from "John & Pam Lees" to Blue Sea reminding those individuals about the loan and stating that "John's interest needs to be protected…".

h. Jacob sent an email to Lees on February 24, 2011 "thanking" Lees for a $500,000 loan from Lees to Blue Sea "in addition to $250,000 already loaned."

i. Jacob sent an email to Lees on October 18, 2011 regarding another loan of $500,000 from Lees to Blue Sea, documenting its terms and promising repayment "by 12/31/11" plus 10% interest.

j. On September 28, 2012, Lees sent an email to Jacob providing him with wire information, and asking that Jacob "[p]lease confirm when this has been done."

Jacob replied by email that same day, stating that he had wired $300,000, and that an additional $200,000 would be forthcoming.

63. Lees never disclosed his interest in Blue Sea, or his activities to assist and promote Blue Sea, to Plaintiffs.

**ZJM**

64. Lees continued this scheme throughout 2012, particularly by secretly attempting to divert New Mar-Lees business opportunities to, and compete with New Mar-Lees using, a new entity called ZJM.  In the spring of 2012, Lees introduced an individual named Zeke Shahin and his company TAF Enterprises, Inc. ("TAF") to Plaintiffs, representing that Lees knew Shahin from the industry and thought he would make a good CEO.  In approximately May or June of 2012, Lees met with Shahin and Plaintiffs in Boston to discuss the possibility of hiring Shahin as an executive at New Mar-Lees and/or acquiring TAF.  At this time, Lees was serving as Co-Chief Executive Officer of New Mar-Lees under a consulting contract between Mar-Lees Seafood, Mar-Lees Holding, JAL Consulting and John Lees, and was responsible for New Mar-Lees' sales efforts.

65. On May 16, 2012, Lees sent an email to Shahin, copying Sweeney, in which Lees provided extensive advice to Shahin as to how best to position himself and Lees with New Mar-Lees' owners and how Lees wanted Shahin to protect Lees' position, including telling Shahin "I am counting on you to land this plane.  Once they [New Mar-Lees owners] announce you then they are stuck to make this work."

66. In or about June and July of 2012, New Mar-Lees was in discussions to purchase a seafood business, variously known as "Captain Carl's" or "Carl's Gourmet Foods," from Carl Masiello.

67. Because of Lees' insider executive role at New Mar-Lees, and because of Sweeney relationship with Lees, they were aware that New Mar-Lees was seeking to purchase Captain Carl's.

68. Unknown to Plaintiffs, in or about July 2012, Lees and Sweeney were simultaneously making plans with Shahin to set up yet another separate company to compete with New Mar-Lees, including by acquiring Captain Carl's.  This new entity, tentatively called ZJM, was intended by Lees and Sweeney to operate in the same business as New Mar-Lees, to buy and sell seafood in the same markets as New Mar-Lees, and thereby to compete with New Mar-Lees.

69. On July 14, 2012, Sweeney emailed Lees and Shahin about setting up "a new LLC to take over the Carl's assets and existing business."  The email refers to the new company as "our new 'clam' venture" with equity to be split 25% for Carl [Masiello], 30% for Zeke [Shahin] 30% for John [Lees] and 15% for MFS [Michael F. Sweeney].

70. The July 14, 2012 email makes clear that Lees and Sweeney were planning to set up a company to acquire TAF or, if Mar-Lees acquired TAF, to do business as a separate entity and compete directly with Mar-Lees while hiding Lees involvement from Plaintiffs.  Among other things, in the July 14, 2012 email Sweeney states:

   a. "I will form a new LLC to take over the Carl's assets and existing business …. I will get George Warner involved (this is our CPA)."

    b.  "I think we will need to put in about $150k initially to fund the repayment of debts and get Carl $5k to buy out his partner…. Let's each be ready to fund our share next week on Friday."

    c.  "As to location, as discusses [sic] this will depend on whether we can get a deal done with [Mar-Lees principals] to purchase TAF.  If we close a deal, we could get a packing agreement in place at ML [Mar-Lees] for our clam business.  If they do not close a deal, I do not feel we can put that business under their [Mar-Lees'] roof due to your [Lees' and Shahin's] non competes."

    d.  "That is also true [if TAF is not acquired by Mar-Lees] as to whether you two [Lees and Shahin] can publicly be the face of this business given your non competes."

71. The July 14, 2012 email made clear that Lees and Sweeney were planning to go directly into competition with Mar-Lees, stating:  "If [Mar-Lees principal] does not agree to a buyout of our TAF venture now, then I think you need to play hard ball and Zeke walks. Then we grow TAF and Clams [the new business] and other ventures on our own with Flagstar [bank]."

72. Further, the July 14, 2012 email demonstrates Sweeney's personal financial interests in this venture:  "In addition to my [Sweeney's] share of the capital, I am contributing the legal time to get this set up as well [as] the time spent on our TAF partnership and dealings with [Mar-Lees principals] to get a deal done for our 75/25 benefit."

73. On July 31, 2012, Sweeney sent an email to Lees (with a copy to Shahin) about promoting business for their new venture, which would compete directly with Mar-Lees. Among other things, Sweeney stated:  "We will form newco today….Then cut final

33

payback schedule. Then fund and move. Where are you [John Lees]/Zeke with new orders?"

74. The same day, Lees responded in an email to Sweeney with a copy to Shahin, making clear the plan to compete in the seafood business by selling to a major supermarket: "Mike Once we open the newco then Zeke will get the new co set up at [a specific New Mar-Lees customer prospect]." The supermarket chain referenced in the email was one that New Mar-Lees was actively seeking as a customer.

75. Sweeney was actively involved in the business planning for the new ZJM venture both as counsel and as a principal, and in the efforts to have ZJM acquire the Captain Carl's business. For example, Sweeney replied by email to Lees, copying Shahin and others, stating "Just met [C]arl [Masiello] and George [Warner]. Forming our LLC now. Made a good plan for transition."

76. On August 2, 2012, an associate attorney at Sweeney's law firm sent an email to Sweeney and Lees that their new company, named "ZJM Holdings LLC" ("ZJM"), had been "formed today in MA." The associate subsequently sent the ZJM charter by email to Lees, Sweeney and Shahin.

77. Also on August 2, 2012, George Warner (the accountant involved in ZJM) sent an email to Carl Masiello (of Captain Carl's) copying Lees and Sweeney, asking Masiello for certain financial information including "a detailed list of what you estimate you will need in working capital to process the initial orders that Zeke and John [Lees] are working on." The accountant went on to state that he and Sweeney "had discussed how to handle the payroll" and "decided … we would leave payroll on your S Corporation …." Sweeney

then forwarded that email to Lees and Shahin, stating "We are formed … We should be ready to fund on Monday once George confirms the exact numbers. We will leave employees on Carl's existing corp until we move so we don't deal with RI payroll."

78. On August 6, 2012, Sweeney sent an email to advise Shahin and Lees that they could "wire in their capital contributions today for the carl's [Carl's Gourmet Foods] deal." Sweeney's email went on to state that "I [Sweeney] gave you the percentages 15/75, 30/75 and 30/75—me [Sweeney], John [Lees] and Zeke [Shahin]. Carl gets 25% once we take in his assets and pay out the $$ to his creditors…. We need the bank account set up by tomorrow to run this money and all future sales through."

79. Lees took an active and direct role in figuring the costs and potential profits of ZJM. For example, in an August 15, 2012 email to accountant George Warner, with copies to Sweeney and Shahin, Lees stated: "George [CPA] needs to get the EXACT cost of the 5-10 items that represent 80% of the business. This is very easy to do. Carl said he does not know how to calculate the labor cost. This is very easy to do….Please get this information once and for all and tie it out. I would like to be on this call tomorrow so I can add value and save us time and land the plane much quicker."

80. Then, on August 16, 2012, Sweeney sent an email to Lees and Shahin in which Sweeney drafted language for Shahin to send to New Mar-Lees summarizing Shahin's key deal terms for the proposed acquisition by New Mar-Lees of TAF's assets, including price and payment terms. Shahin then used the language provided by Sweeney in his email to New Mar-Lees. On August 28, 2012, Lees sent an email to Shahin. Shahin replied by email,

stating among other things that "to set the deal up you asked me to give up initially 20% then became 25% of the sale of TAF to you and Mike [Sweeney]."

81. Defendants' competitive plans for ZJM were ultimately foiled when Mar-Lees (a) hired Shahin as New Mar-Lees' CEO and acquired Shahin's and TAF's customer lists and relationships, and (b) hired Carl Masiello and acquired Captain Carl's.

## Use of the Mails and Wires in Furtherance of This Fraudulent Scheme

82. Defendants used the mail and wire communications described above in furtherance of, and to create and manage, their fraudulent scheme.

83. These communications were interstate in nature, since:

a. They travelled across state lines, including between Massachusetts (where Old Mar-Lees has its office), Rhode Island (where Sweeney and Duffy & Sweeney have their office), and New Jersey (where Blue Sea has its office); and

b. On information and belief, the email communications used an email server outside of Massachusetts.

## Fraudulent Schemes and Kickbacks From Seafood Sales Involving Blue Sea

84. Lees used his insider executive position at New Mar-Lees to carry out a series of fraudulent schemes via which Lees obtained kickbacks, Blue Sea and Jacobs obtained profits, and New Mar-Lees was subjected to higher prices than it would have had to pay but for the kickback schemes. Each of these kickback schemes consisted of the following basic pattern:

a. Lees would purchase, using his own funds, a large volume of tilapia fish, which would be held in storage;

36

b.   The tilapia would be held in the name of Blue Sea or another straw, rather than of
Lees;

c.   After approximately a month, TAF would purchase the tilapia from the straw entity at
a price higher than paid originally by Lees;

d.   Lees would receive a pre-arranged approximate eight percent (8%) kickback built
into the higher price paid by TAF; and

e.   TAF would then sell the tilapia to New Mar-Lees at an additional markup, funding
both the kickback to Lees and the additional profits to Blue Sea and TAF.

85.   In each case Blue Sea and Jacob agreed with Lees to participate in these schemes, and
took multiple actions in furtherance of the schemes, by receiving and holding the tilapia,
entering into the round trip transactions with TAF, and delivering ownership of the tilapia
to Lees upon demand.

***The December 22, 2011 Kickback Scheme***

86.   On December 22, 2011, Lees purchased twenty thousand (20,000) cases of tilapia from
TAF, and held the fish in the name of Blue Sea.  On December 22, 2011 Lees sent an
email to Shahin at TAF and Jacob at Blue Sea informing them as to how the transaction
would work, stating:  "[a]s I mentioned, I will be running this thru Bluesea Products....
He will be the customer of record on this transaction."  Lees sent an email later on
December 22, 2011 to Shahin stating that "[t]his is confirmation that (I) John Lees will be
wiring 1,020,000.00 (one million and twenty thousand dollars) to your account below....
Please confirm that you will release 20,000 cases of the all natural [specific supermarket
brand] tilapia to Thomas Jacob account in LA preferred This  [sic] amount 20,000 cases

at 51.00 per case equals to [sic] the 1,020,000.00 that will be wired to your account....

Please confirm that you will wire 1,100,000.00 (one million one hundred thousand) back

into John Lees account on or before January 31, 2012....  Once that wire is complete back

to me (on or before January 31, 2012) we then will release all 20,000 cases back to your

account."  Lees then personally wired one million and twenty thousand dollars

($1,020,000) for the purchase, but the tilapia was held in the name of "Global Sourcing

Alliance Inc. c/o Blue Sea Products LLC."

87. On December 22, 2011, Jacob sent an email to Lees attaching an executed "purchase

order contract" for $1,020,000 worth of tilapia.  The December 22, 2011 purchase order

specified that "Global Sourcing Alliance Inc. is acting purely as custodian on behalf of

John A. Lees in this transaction."

88. The terms of the purchase were that TAF would pay Lees back one million one hundred

thousand dollars ($1,100,000) by January 31, 2012, and Lees would return the tilapia to

TAF. More specifically, on December 30, 2011, Lees sent an email to Shahin at TAF

with an attached "purchase order contract" for $1,020,000 of tilapia; this purchase order

includes the payment terms "John A. Lees will wire the funds of $1,020,000 ... and

Global Sourcing Alliance Inc is acting solely as custodian on behalf of John A Lees in

this transaction ... TAF Enterprises Inc guarantees to pay back John A Lees by Jan 31st

$1,100,000 and Global Sourcing Alliance will transfer back the product to TAF

Enterprises after receipt of wire transfer into the account of John A Lees."

89. Lees, Jacob, Blue Sea, and TAF completed the transactions as described.

90. Lees received eighty thousand dollars ($80,000) (the difference between one million one hundred thousand dollars ($1,100,000) and one million and twenty thousand dollars ($1,020,000)) as a kickback.

91. On information and belief, TAF then sold the twenty thousand (20,000) cases of tilapia to New Mar-Lees at a price high enough to cover the kickback and generate a profit for Blue Sea and Jacob.  Lees recommended and approved the transaction on behalf of New Mar-Lees in his capacity as Co-Chief Executive Officer.

***The January 16, 2012 Kickback Scheme***

92. Lees, Jacob, Blue Sea, and TAF repeated the transaction with ten thousand (10,000) cases of tilapia on January 16, 2012.  The terms of the arrangement were identical, except that Lees paid five hundred and ten thousand dollars ($510,000) for the tilapia, and was repaid five hundred and fifty thousand dollars ($550,000), thus receiving a forty thousand dollar ($40,000) kickback.  More specifically:

   a. On January 16, 2012, Shahin sent an email to Lees stating that "[t]he product has been transferred to Global Sourcing, 10,000 cases of Tilapia @ $51/case, we will take the product back on February 29th with a payment back to you at $55/case."

   b. Two days later, on January 18, 2012, Shahin sent an email to Lees with an executed confirmation that "I (John Lees) will be wiring $510,000 ... to your account in TD BANK today ... TAF Enterprises released 10,000 cases of Global Sourcing Alliance (care of Blue Sea products LLC) on 1/16/12 this represents value of $510,000.00 ... TAF Enterprises will wire back $550,000 ... on February 29, 2012 ... Global Sourcing

Alliance will transfer to TAF Enterprises 10,000 cases back on February 29, 2012 once wire is competed to John Lees."

    c.    Later on January 18, 2012, Biju Parekkatt of Blue Sea sent an email to Lees with an attached purchase order and bills of lading "for transfer of 10,000 cases" of tilapia; the purchase order contains the terms to effect the round trip sale and kickback payment.

93.    On information and belief, TAF then sold the tilapia to New Mar-Lees at a price high enough to cover the kickback and generate a profit for his co-conspirators, Blue Sea and Jacob.  Lees recommended and approved the transaction on behalf of New Mar-Lees in his capacity as Co-Chief Executive Officer.

***The March 30, 2012 Kickback Scheme***

94.    Lees, Jacob, Blue Sea, and TAF repeated the transaction with twenty thousand (20,000) cases of tilapia on March 30, 2012.  The terms of the arrangement were identical to the December 22, 2011 deal, so that Lees received an eighty thousand dollars ($80,000) kickback from this arrangement.

*Additional Kickback Schemes*

95.    On information and belief, Lees, Jacob, Blue Sea, and TAF made similar arrangements for other seafood purchases, including but not limited to purchases of salad shrimp in or about February through May of 2012, including, for example:

    a.    On February 24, 2012, Jacob sent an email to Lees regarding a February 28, 2012 purchase order from TAF to Blue Sea for "5 loads" (of 2,000 cases each) of tilapia,

and asking that Lees "confirm receipt of funds and authorize release of 5 loads requested below."

b. On May 1, 2012, Lees sent an email to Jacob and Shahin regarding the sale of "two loads of shrimp" being sold from Blue Sea to TAF.

96. On information and belief, TAF then sold the seafood to New Mar-Lees at a price high enough to cover the kickback and generate a profit for Blue Sea and Jacob.  Lees recommended and approved the transactions on behalf of New Mar-Lees in his capacity as Co-Chief Executive Officer.

97. In addition, Lees, Shahin and Jacob routinely communicated by email about other costs associated with the scheme , including, for example:

a.  A March 23, 2012 email from Jacob to Lees relating to payment of TAF's storage bills for tilapia.

b.  A March 29, 2012 email from Lees to Shahin relating to payment of TAF's storage bills for tilapia.

98. Lees concealed his involvement in any of the transactions described above from Plaintiffs.

99. In each of the transactions described above, after the transactions were complete, on information and belief, TAF sold the seafood to New Mar-Lees.

100. In each transaction described above, New Mar-Lees could have directly purchased the seafood products at the original, lower price, rather than the later inflated price at which Lees arranged for New Mar-Lees to purchase the products.

101. New Mar-Lees therefore was deceived into purchasing the seafood products at an artificially increased price.

**Use of the Mails and Wires in Furtherance of the Kickbacks**

102. On information and belief, Lees, Shahin and Jacob used mail and wire communications in furtherance of, and to create and manage, the fraudulent schemes regarding the kickbacks paid to Lees by Jacob and Blue Sea.

103. These communications were interstate in nature, since:

    a. They travelled across state lines as between Massachusetts (where Old Mar-Lees has its office) and New Jersey (where Blue Sea has its office); Florida (where Plaintiffs have their office, and where Lees and JAL occasionally office); and

    b. On information and belief, the email communications used an email server outside of Massachusetts.

**CAUSES OF ACTION**

**COUNT 1**
**Violation of RICO, 18 U.S.C. §1962(c)**
**(The Mar-Lees Enterprise)**

1. Plaintiffs repeat the allegations stated in all prior paragraphs.

2. Defendants Lees and ML Holdings are persons within the meaning of 18 U.S.C. §1961(3).

3. The association in fact among John Lees, Old Mar-Lees and New Mar-Lees, constituted an "enterprise" as defined in 18 U.S.C. §1961(4) (the "Mar-Lees Enterprise"). The Mar-Lees Enterprise engaged in and affected interstate commerce.

4. Defendants Lees and ML Holdings conducted and participated in the conduct of the affairs of the Mar-Lees Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1) and 1961(5), which included multiple instances of mail fraud in violation of 18 U.S.C. §1341, multiple instances of wire fraud in violation of 18 U.S.C. §1343, and multiple instances of commercial bribery in violation of state law, specifically Massachusetts General Laws c. 271, §39, as described in detail above. Defendants Lees and ML Holdings devised and carried out the fraudulent schemes as described in detail above.

5. Plaintiffs have been injured in their business or property by reason of the RICO violations described above.

6. Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

7.    By virtue of these violations of 18 U.S.C. §1962(c), Defendants Lees and ML Holdings

are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have

sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT 2**
**Violation of RICO, 18 U.S.C. §1962(c)**
**(The Old Mar-Lees Enterprise)**

1.    Plaintiffs repeat the allegations stated in all prior paragraphs.

2.    Defendants Lees and ML Holdings are persons within the meaning of 18 U.S.C.

§1961(3).

3.    Old Mar-Lees (the "Old Mar-Lees Enterprise"), a Massachusetts limited liability

company, is an "enterprise" within the meaning of 18 U.S.C. §1961(4).  The Old Mar-

Lees Enterprise engaged in and affected interstate commerce.

4.    Defendants Lees and ML Holdings conducted and participated in the conduct of the

affairs of the Old Mar-Lees Enterprise through a pattern of racketeering activity within

the meaning of 18 U.S.C. §§1961(1) and 1961(5), which included multiple instances of

mail fraud in violation of 18 U.S.C. §1341 and multiple instances of wire fraud in

violation of 18 U.S.C. §1343, as described in detail above.  Defendants Lees and ML

Holdings devised and carried out the fraudulent schemes as described in detail above.

5.    Plaintiffs have been injured in their business or property by reason of  the RICO

violations described above.

6.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering

activity as described above.

7.  By virtue of these violations of 18 U.S.C. §1962(c), Defendants Lees and ML Holdings are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT 3**
**Violation of RICO, 18 U.S.C. §1962(c)**
**(The New Mar-Lees Enterprise)**

1.  Plaintiffs repeat the allegations stated in all prior paragraphs.

2.  Defendants Lees and ML Holdings are persons within the meaning of 18 U.S.C. §1961(3).

3.  New Mar-Lees (the "New Mar-Lees Enterprise"), a Massachusetts limited liability company, is an "enterprise" within the meaning of 18 U.S.C. §1961(4).  The New Mar-Lees Enterprise engaged in and affected interstate commerce.

4.  Defendants Lees and ML Holdings conducted and participated in the conduct of the affairs of the New Mar-Lees Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1) and 1961(5), which included multiple instances of mail fraud in violation of 18 U.S.C. §1341, multiple instances of wire fraud in violation of 18 U.S.C. §1343, and multiple instances of commercial bribery in violation of state law, specifically Massachusetts General Laws c. 271, §39, as described in detail above. Defendants Lees and ML Holdings devised and carried out the fraudulent schemes as described in detail above.

5.  Plaintiffs have been injured in their business or property by reason of the RICO violations described above.

6.  Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

7.  By virtue of these violations of 18 U.S.C. §1962(c), Defendants Lees and ML Holdings are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

### COUNT 4
### Violation of RICO, 18 U.S.C. §1962(d)
### RICO Conspiracy -- Sweeney and Duffy & Sweeney

1.  Plaintiffs repeat the allegations stated in all prior paragraphs.

2.  Section 1962(d) of RICO provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subdivision (a), (b) or (c) of this section."

3.  Sweeney engaged in the activities described above both individually and in his capacity as a shareholder in Duffy & Sweeney. Sweeney and Duffy & Sweeney are persons within the meaning of 18 U.S.C. §1961(3). Sweeney and Duffy & Sweeney violated Section 1962(d) by conspiring with Lees to violate 18 U.S.C. §1962(c).

4.  As described in detail above, Sweeney and Duffy & Sweeney engaged in numerous overt acts, and numerous predicate acts of racketeering in furtherance of the conspiracy.

5.  The nature of the above-described acts, material misrepresentations and omissions in furtherance of the conspiracy gives rise to an inference that Sweeney and Duffy & Sweeney not only agreed to the objective of the RICO conspiracy described above, but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

6.  Sweeney and Duffy & Sweeney are liable for the acts carried out, and the harm caused, by their co-conspirators.

7.  As a direct and proximate result of Sweeney's and Duffy & Sweeney's acts in furtherance of the conspiracy to violate 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to be injured in their business or property.  By virtue of these violations of 18 U.S.C. § 1962(c), Sweeney and Duffy & Sweeney are jointly and severally liable with all other Defendants to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT 5**
**Violation of RICO, 18 U.S.C. §1962(d)**
**RICO Conspiracy – NorAtlantic 21 and NA Holdings**

1.  Plaintiffs repeat the allegations stated in all prior paragraphs.

2.  Section 1962(d) of RICO provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subdivision (a), (b) or (c) of this section."

3.  NorAtlantic 21 and NA Holdings are persons within the meaning of 18 U.S.C. §1961(3).

4.  NorAtlantic 21 and NA Holdings violated Section 1962(d) by conspiring with Lees to violate 18 U.S.C. §1962(c).

5.  As described in detail above, NorAtlantic 21 and NA Holdings engaged in numerous overt acts, and numerous predicate acts of racketeering in furtherance of the conspiracy.

6.  The nature of the above-described acts, material misrepresentations and omissions in furtherance of the conspiracy gives rise to an inference that NorAtlantic 21 and NA Holdings not only agreed to the objective of the RICO conspiracy described above, but

were aware that their ongoing fraudulent acts were and are part of an overall pattern of racketeering activity.

7.   NorAtlantic 21 and NA Holdings are liable for the acts carried out, and the harm caused, by their co-conspirators.

8.   As a direct and proximate result of the acts by NorAtlantic 21 and NA Holdings in furtherance of the conspiracy to violate 18 U.S.C. §1962(c), Plaintiffs have been and continue to be injured in their business or property as set forth more fully above.  By virtue of these violations of 18 U.S.C. §1962(c), NorAtlantic 21 and NA Holdings are jointly and severally liable with all other Defendants to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

### COUNT 6
### Violation of RICO, 18 U.S.C. §1962(d)
### RICO Conspiracy – Blue Sea and Jacob

1.   Plaintiffs repeat the allegations stated in all prior paragraphs.

2.   Section 1962(d) of RICO provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subdivision (a), (b) or (c) of this section."

3.   Blue Sea and Jacob are persons within the meaning of 18 U.S.C. §1961(3).

4.   Blue Sea and Jacob violated Section 1962(d) by conspiring to violate 18 U.S.C. §1962(c).

5.   As described in detail above, Blue Sea and Jacob engaged in numerous overt acts, and numerous predicate acts of racketeering in furtherance of the conspiracy.

6.   The nature of the above-described acts, material misrepresentations and omissions in furtherance of the conspiracy gives rise to an inference that Blue Sea and Jacob not only

agreed to the objective of the RICO conspiracy described above, but were aware that their ongoing fraudulent acts were and are part of an overall pattern of racketeering activity.

7. Blue Sea and Jacob are liable for the acts carried out, and the harm caused, by their co-conspirators.

8. As a direct and proximate result of Blue Sea and Jacob's acts in furtherance of the conspiracy to violate 18 U.S.C. §1962(c), Plaintiffs have been and are continuing to be injured in their business or property as set forth more fully above.  By virtue of these violations of 18 U.S.C. §1962(c), Blue Sea and Jacob are jointly and severally liable with all other Defendants to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

    A.  That Defendants be held jointly and severally liable for:

        1.  Threefold the damages sustained by Plaintiffs as a result of Defendants' violations of RICO;

        2.  The costs of this suit, including reasonable attorneys' fees; and

    B.  Such other relief as the Court deems necessary and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Respectfully submitted,

MAR-LEES SEAFOOD, LLC,
MAR-LEES HOLDING LLC, and
SEAFOOD DEVELOPMENT PARTNERS, LLC

By their attorneys,


*/s/ Nicholas C. Theodorou*
Nicholas C. Theodorou (BBO #495730)
ntheodorou@foleyhoag.com
Anthony Mirenda (BBO #550587)
amirenda@foleyhoag.com
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA  02210
617-832-1000

Of counsel:

David K. Bowles
Di Santo Bruno LLP
175 Varick Street, Suite 257
New York, NY 10014
dbowles@disantolaw.com

Dated:  Friday, October 25, 2013